**Wanda MASSEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 60752.**

Court of Criminal Appeals of Texas, Panel No. 2.

Oct. 28, 1981.

Rehearing Denied Dec. 16, 1981.

---

Michael A. Robertson and Kim Thorne, Grand Prairie, for appellant.

Henry M. Wade, Dist. Atty. and John Tatum, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and TOM G. DAVIS and CLINTON, JJ.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for false imprisonment. V.T.C.A., Penal Code, § 20.02. After guilt was determined by a jury, the court assessed appellant's punishment at nine days in county jail and a fine of $685.00.

At the outset appellant challenges the sufficiency of the evidence to sustain the conviction.

V.T.C.A., Penal Code, § 20.02, provides in part:

"(a) A person commits an offense if he intentionally or knowingly restrains another person."

V.T.C.A., Penal Code, § 20.01, provides in part:

"In this chapter:

"(1) 'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. Restraint is 'without consent' if it is accomplished by:

"(A) force, intimidation, or deception; or . . . ."

V.T.C.A., Penal Code, § 6.03, provides in part:

"(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

"(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."

See also V.T.C.A., Penal Code, § 1.07(a) (18) and (19).

Omitting the formal parts, the information alleged the appellant on or about the 6th day of December, A.D. 1976 "did unlawfully intentionally and knowingly by force, intimidation and deception restrain John Alley without his consent by restricting the movements of the said John Alley . . . ."

Obviously finding no evidence to show force or deception, the court submitted only the issue of restraint by intimidation to the jury in its charge. The court also charged on the law of circumstantial evidence.

At the time of the alleged offense the appellant Massey was the administrator of the Forest Manor Nursing Home in Dallas. At such time John Alley, the complaining witness, had resided at Forest Manor for approximately three months. Robert Allen, Alley's son,[1] related Alley suffered from "sugar," apparently meaning he suffered

---

1. Allen testified his father left home when he was a small child and that at school his name was misspelled and never corrected so he adopted the name "Allen."

from a diabetic condition. Allen stated his father needed shots and three meals a day and he couldn't take care of him at his (Allen's) home, and that Alley had been taken to Forest Manor.

Apparently on Friday, December 3, 1976, Allen came to Forest Manor stating he wanted to take his father home for the day. Permission was granted by the appellant. Allen took his father to the Oak Cliff Nursing Home and made arrangements to move him there. Upon their return to Forest Manor, Alley went to his room. Allen approached the appellant and informed her he intended to take his father out of Forest Manor. Allen related appellant stated, "Yeah, you can take him out if you give me six hundred and seventy-five dollars. I know you can't raise that." Allen asked if some kind of arrangement could be made and appellant stated, "Yeah, for six hundred and seventy-five dollars." [2]

At another point Allen testified, "Yeah, she told me, said 'Well, you can take him and pay me so much a month' or however I get paid, I could make some kind of arrangements." Then when questioned again he stated the appellant told him he could not make arrangements, that she wanted her money for expenses incurred.

After his conversation with the appellant, Allen returned to his father's room and told him, "Well, she won't let you go and wait until Monday and I see what can I do about it." There is no showing Allen mentioned to his father that a bill was due.

On Monday, December 6, 1976, Allen went to the Oak Cliff Nursing Home, and then went downtown to "Mr. Bill's" office, an individual who is not otherwise identified in the record. He was then referred to Nancy Tracey, an attorney employed by the Older Americans Legal Action Center. Tracey that day tape recorded a telephone conversation Allen had with the appellant in which appellant stated, "Bring me his money to pay for him being here, and you can have him." Told that Alley was "set up in another folks' home" appellant replied, "Well, that's just fine and dandy. You

bring me my money, and then you can move him anywhere you want to, I don't care."

At the conclusion of the conversation Tracey called the police. According to Allen two officers met him at Forest Manor and they talked to the appellant, who said Allen couldn't "get" his father. The police asked Allen why he didn't pay the bill. Thereafter, the police officers telephoned to "Mr. Bill" or Tracey or both. Tracey related she received a call from the police, and while talking to them, received a telephone call on another line from the appellant who wanted to discuss payment of Alley's bill. Tracey stated she would discuss that with Alley's family and inquired if appellant would release Alley. Appellant stated she didn't want to until she got her money, but when asked if she would release him, even if she didn't want to, appellant replied, "What choice do I have?" Tracey told appellant she didn't believe the appellant had a choice. Appellant then stated she would release Alley and sue him.

Allen testified that the police officers went with him to his father's room, and that he took his father and his belongings to the Oak Cliff Nursing Home.

John Alley, the complaining witness, was apparently difficult for the jury to understand. A nurse's aide at the Oak Cliff Nursing Home was asked to interpret his answers. Nevertheless, much of his testimony was in answer to leading questions or unresponsive to the interrogation, or he answered questions with questions.

Alley testified he resided at the Oak Cliff Nursing Home, and that previously he had resided for three months at the Forest Manor Nursing Home. He liked Oak Cliff better than Forest Manor, and both homes better than living at his son's house. He related that while at Forest Manor on occasion he went to a nearby grocery store with a nurse and would get a hamburger and a soda water. In expressing dissatisfaction with Forest Manor and his desire to leave, the record reflects on direct examination:

**2.** Later testimony showed the bill owed was actually $685.75.

"Q Now, Mr. Alley, you told the Court that you wanted to leave Forest Manor Nursing Home.

"A (By the interpreter) Yes, I found out how she treated other people.

"Q Did you think that might happen to you?

"A (By the interpreter) Uh-huh."

Alley related that he had seen somebody outside of the nursing home being "drug" back to the nursing home. Surrounding circumstances were not related nor was there any showing that the appellant was involved.

When asked if he ever tried to leave the home before the son took him away, he stated, "I was going to the store one day and she said 'Don't go out that door.'"

"Q Is that why you didn't leave the nursing home again?

"A (By the interpreter) Yes, I couldn't go out of the house, where was I going?

\* \* \* \* \* \*

"Q All right. At that moment when you wanted to leave, did you try to walk out the door?

"A (By the interpreter) No.

"Q Why not?

"A (By the interpreter) What was I going out there for.

\* \* \* \* \* \*

"Q Before your son got there and before the police got there, did you try to leave the nursing home by yourself?

"A (By the interpreter) No, I was going to the store and she said 'No'.

"Q That was a different time, though, when you were going to the store and she told you you couldn't leave?

"A (By the interpreter) Yes 'Don't go out that door.'"

At one point Alley testified, "I couldn't fight. I had to do what she said." The record also reflects:

"Q Were you afraid that something might happen to you if you tried to leave the nursing home before your son got there?

"A Yes.

"Q What were you afraid might happen?

"A Ain't no telling.

"Q Were you afraid that something might happen to you?

"A I knew something was going to happen to me if I go out that door.

"Q Mr. Alley, who did you think was going to do something to you?

"A That boy or that woman.

"Q Who do you mean by 'that woman'?
"THE WITNESS: What is her name?

"Q Wanda Massey.

"A Uh-huh.

"Q Your answer is Wanda Massey?

"A Uh-huh.

"Q Were you afraid of Wanda Massey that day?[3]

"A Yes."

Later Alley testified he had no recollection of going to the Oak Cliff Nursing Home several days before he left Forest Manor. Further, he did not testify that his son told him of his conversation with the appellant on December 3, 1976 or that such conversation intimidated him in any way. There was never any showing that Alley ever knew of his son's telephone conversation with the appellant on December 6, 1976.

Eunice Lee, a nurse's aide, testified that Alley was a man in his late sixties or early seventies, was partially paralyzed on one side, and walked with the support of a walking stick or a railing in the nursing home. She stated Alley would go with some employee of the home to Angelo's grocery store three blocks away to buy soda water and crackers. She explained the traffic was heavy on Forest Avenue and the nursing home had problems with some patients, many of whom were confused, who wandered onto the street.

Lee also related Alley's son, Robert Allen, came to the home smelling like alcohol; that they argued constantly, with the son wanting his father to turn money over to him.

---

**3.** The record was never clarified to show which day was referred to in the question.

Ola Mae Gibson, a nurse's aide, testified Alley sat by the door of Forest Manor most of the time until he got ready to go to the store. She saw Alley's son twice at the home, and both times he was intoxicated and talking loud. He seemed angry with his father and was asking for money.

Irma Jean James, activity director, testified that Alley went to the store usually in the company of an aide. This was customary procedure at Forest Manor as the traffic outside the home was heavy. She had seen Alley's son there twice in a drunken condition, staggering up against the walls.

Wanda Massey, age 62,[4] testified she was administrator of Forest Manor from May, 1975 to August 24, 1977. There were 52 employees and 120 beds, with usually 116 to 118 residents, many of whom were mentally ill and suffered from chronic alcoholism. She related that Alley was partially paralyzed and walked with a limp. She stated Forest Manor was 25 to 30 feet from the street with heavy traffic.

She denied telling Allen he couldn't take his father, that she didn't think she had authority to hold Alley and did not intend to hold him. She denied she ever told Alley he could not leave. Although she did not specifically remember it, she could have on an earlier date told him not to leave to go to the store, as a man in his condition could have been hit if he slipped off the curb, and she wanted someone to go with him. She could have asked him to wait.

On direct examination she was asked:

"Q Did you ever do any act or anything that you believe would reasonably cause him to think that he could not leave?

"A Sir, I had no cause to."

She related that Allen had taken his father from the home on a number of occasions. She was responsible for collecting payments at Forest Manor and that Alley's correct bill was $685.75, which was never

paid as far as she knew.[5] She would have been willing for Allen to make partial payments as she had done for others for she knew "they were getting some money." While she denied telling Allen he could not have his father, she admitted that in the taped conversation with Allen on December 6, 1976, she probably said "Yeah, bring me my money and you can have him, that's it."

Appellant Massey saw no police officers on December 6, 1976, when Alley left Forest Manor. Lou Phillips, an employee of Forest Manor, didn't see any policemen at Alley's room when he left, and she knew the appellant was in her office at the time.

Edgar Moore, custodian of the Dallas city police records, testified for the defense the records did not show the police made a call at Forest Manor on December 6, 1976.

Officer William Pitts, called by the State in rebuttal, explained the procedure by which the Dallas police were required to make reports and when they weren't. He related that while on "patrol" a detective contacted him and he went alone to Forest Manor on December 6, 1976. He talked to "someone" outside Forest Manor and learned there was a dispute over money, a "non-payment or something like that." He was more or less in the "dark" about what was going on. He never saw Wanda Massey. He did not observe anyone forcibly preventing anyone from leaving Forest Manor. No police action was taken and no report was made.

Nancy Tracey related she tried three times unsuccessfully to file a criminal complaint with the district attorney's office in December of 1976. She also planned to file a civil suit. It was only after newspaper publicity about nursing homes in the Dallas area some months later that she went to the Attorney General's office, and subsequently the complaint and information were filed on October 13, 1977 by the district attorney.

---

4. The appellant testified she had had a stroke and three heart attacks, was retired and took part-time care of her 83 year old mother.

5. Robert Allen in his testimony confirmed that the bill at Forest Manor had never been paid. His excuse was that the police told him not to go back there.

The complaint and information alleged that the false imprisonment occurred on or about December 6, 1976. It was the State's theory that the false imprisonment occurred between Friday, December 3 and Monday, December 6, 1976.[6]

The question is whether the evidence shows on those dates that the appellant intentionally or knowingly restrained Alley by restricting his movements without consent so as to interfere substantially with his liberty by confining him.[7] If there was any lack of consent shown, it was by intimidation as there was no showing of force or deception.

The evidence was undisputed that frequently while Alley was at Forest Manor he left with his son on a number of occasions, and that in company of a nurse's aide he often visited nearby grocery stores. On Friday, December 3, 1976, he left with his son. Allen, the son, stated they went to Oak Cliff Nursing Home. Alley in his testimony did not recall any such visit to that nursing home. Upon their return to Forest Manor, Allen alone, had a conversation with the appellant and related she wanted her money before she would release Alley. Allen related only that he simply told his father that "she" wouldn't let him go and to wait until Monday. There was no showing that the bill due was mentioned to Alley.

From the time Alley returned to Forest Manor on December 3rd until he left on December 6th there was no showing that appellant saw or spoke to Alley or took any action to confine him by intimidation or otherwise.

The State tried to elicit from Alley why he didn't leave Forest Manor during the December 3rd to 6th period. Alley responded that when he was going to the store one day appellant told him "Don't go out that door." He admitted, however, that was an earlier occasion, and the circumstances surrounding that admonishment were not developed. On other occasions Alley in response to the State's questions about leaving answered "Where was I going?" and "What was I going out there for?" Alley was also told by his son on December 3rd to wait at Forest Manor until December 6th.

The State relied heavily upon appellant's conversations with the son, Allen, on December 3rd and December 6th. Alley, however, never did testify that he was made aware of the conversation on the 3rd or that he was intimidated thereby. There was no showing that he knew before he left Forest Manor on the 6th of the telephone conversation conducted earlier that day.

Allen testified that two police officers talked to the appellant and helped him remove his father from Forest Manor. This was contradicted by defense testimony. When the defense showed there was no record of a police call to Forest Manor on the date in question, the State called officer Pitts, who testified he went alone to Forest Manor at the request of a detective. He learned from someone outside there was a dispute over money. He never saw or talked to the appellant. He took no police action and made no report. Pitts' testimony impeached the earlier State's testimony of Allen about the action of the police.

Alley did testify that he found out how "she" was treating other people, that he couldn't fight and was afraid something might happen, etc. This generally related to his general dissatisfaction with Forest Manor and the appellant rather than any

---

6. In assessing punishment, the record reflects:
   "THE COURT: ... Mrs. Massey, I assess your punishment at three times the amount of evidence of time that the evidence as believed by the jury that you kept the complaining witness in, that would be Friday to Monday and that would be nine days. In addition I assess a fine of six hundred and eighty-five dollars, application of probation denied...."

It is interesting to note that the fine almost matched the amount of the bill due Forest Manor Nursing Home. At the time of sentencing and the giving of notice of appeal, counsel was appointed for the appellant on the basis of her indigency.

7. There was no showing that appellant restricted Alley's movements by moving him from one place to another. See V.T.C.A., Penal Code, § 20.01.

action by appellant between December 3rd and 6th which resulted in his false imprisonment.

Viewing the evidence in the light most favorable to the verdict of guilt, we cannot conclude the evidence is sufficient to sustain the conviction. See and cf. *Herring v. Boyle*, 1 C.M. & R. 378, 148 Eng.Rep. 1126 (1834).

For the reasons stated, the judgment is reversed and a judgment of acquittal is ordered.